John H. Murphy-

<span>-vs-</span> John Barton Payne,
~~William G. McAdoo,~~
Director General of Railroads.

No. 7882.

Court of Appeal.

Parish of Orleans.

----------

----------

Dinkelspiel. J.

----------

185

Dinkelspiel- J.

Plaintiff sues defendant, Director General of Railroads, and as such Director General of the Southern Pacific Railroad Company, a corporation engaged in the business of transporting passengers and freight by steamship and otherwise, with a branch office in the City of New Orleans, being justly and truly indebted unto plaintiff in the full sum of $825.50., from April 17th. 1918, until paid, and also for legal interest in the sum of $5.000.00., from April 17th. 1918, until paid, for this, to-wit;

That on or about April, 15th., 1918, plaintiff delivered to said Southern Pacific Company at New Orleans, for loading on the steamship Momus, owned and operated by said company, for shipment to New York, seven boilers, four thereof being each 84 x 30- 250 H. P., and three thereof being 96 x 32 - 350 H. P.

That persuant to arrangement between plaintiff and the said Southern Pacific Company, said boilers were delivered by said plaintiff to said Company at it's switch, situated at Elysianfields Street and the river front, in the City of New Orleans, and upon the delivery of said boilers said company took exclusive charge thereof, including their loading on to said steamship.

That after said boilers were delivered to said company, as above set forth, it was unable to load same on to said steamship with it's own derrick because of the fact, as plaintiff is advised, that it's derrick boat was ordered laid up for repairs on the day said loading was to be done.

That thereupon said company suggested to plaintiff that it would arrange with one Henry Peters to load said

boilers on to said steamship, and accordingly said Peters
proceeded to said loading, under exclusive direction and
control of said Southern Pacific Company.

That during the course of the loading of said
boilers on to said steamship, one of them 96 x 32- 350
H. P., was allowed to drop into the hold of said steam-
ship as the result of the negligence of said company,
it's employees and agents,including said Peters, and as
a result thereof the boiler was damaged to such an extent
that plaintiff was obliged to expend the sum of $825.50.,
to put it in the same condition in which it was before
it was damaged, as per itemized statement annexed thereto,
as part of the petition; that the damage to said boiler
above set forth occurred on or about April, 17th. 1918.

Plaintiff further claims that in addition done to the damage
to said boiler it was prevented from delivering same to
the party to whom it was sold, the Brandeo Company of
Compos, Brazile, and that he has been unable to procure
booking for Brazil or to dispose of said boiler, there-
fore has been deprived of the use of the purchase price
agreed upon, to-wit, $5.000.00., since the date when said
boiler was damagaed, April, 17th. 1918.-plaintiff is
therefor entitled to recover from defendant legal in-
terest on the sum of $5.000.00., from April, 17th. 1918,
until paid, in addition to the sum of $825.50.

Plaintiff further shows, that said Peters was sel-
ected by the said Southern Pacific Company, and all of
his work in connection with the loading of said boilers
on to the steamship was under the exclusive control of
the said Southern Pacific Company.

Plaintiff further shows, that after delivering
said boilers to said Company at it's Elysianfields
Street switch, as above setforth, he had no further

control of any kind over said boilers, but, on the contrary, their further disposition, including the loading on to the steamship was subject to the exclusive control,and direction of said company, and said Director General, defendant, is liable for all damages and loss sustained by him as the result of the negligence of said Southern Pacific Company, it's agents and emplo -yees, including the said Peters.

Plaintiff further shows, at the time of the dam age to said boiler, that defendant was Director General of Railroads, and as such Director General of said Southern Pacific Company, and the acts of said company, it's officers, agents and employees, were the acts of said Director General and he is responsible therefor to plaintiff.

Alleging amicable demand without avail, plain- tiff prays for judgment in the amounts heretofore set forth.

Defendant, Director General of Railroads, for answer to plaintiff's petition says; He denies, that at the time stated plaintiff delivered to said Southern Pacific Company at New Orleans, for loading on the steamship Momus, for shipment to New York, seven boilers or any part thereof.

Admits, that the stemship Momus was at the the time in question owned' by the Southern Pacific Co., but avers that said vessel was not operated by that company but by respondent.

Forther answering, denies the allegations in the petition, but asserts, the truth is, that ordinar- defendant ily p̶l̶a̶i̶n̶t̶i̶f̶f̶ loads heavy shipments, such as the one now in question, aboard steamships by means of a

Southern Pacific Derrick Boat, but this loading is not a part of the transportation service, is not covered by a transportation charge, is not provided for in defendants tariff as a duty of the carrier, but as a duty of the shipper, defendant when requested and is able to do so performs this duty for a shipper for an agreed compensation. When the loading of this shipment was to be done, defendants Derrick Boat which is used for such service was out of commission, and defendant was therefor unable to perform such service for plaintiff, and defendant on behalf of plaintiff arranged with one Henry Peters to do the loading for plaintiff with a Derrick Boat belonging to said Peters, the arrangement with Peters being made for plaintiffs account; that plaintiff acknowledged and consented, defendant acting in this connection merely as plaintiff's agent in attending to the matter.

Further shows, that under this arrangement a agreed to by all the parties, Peters acting for plaintiff had exclusive charge of the loading of said shipment aboard ship, and that delivery to defendant was to be made only upon proper loading of the said shipment aboard ship.

Further answering, to Paragraph 4, defendant says, six of said boilers were delivered to defendant at the time stated, but, that the seventh boiler was never delivered; that it is true that the carrier was unable to load said with it's own Derrick Boat because the said Derrick Boat was, at the time in question, laid up for repairs.

Further answering to Paragraph 5, defendant desies the allegations therein contained, and asserts

that the facts with regard to the arrangements are fully and accurately stated in Paragraph 3.; that the loading was actually done under the exclusive direction and control of the said Peters, acting, as above shown, as the agent of plaintiff.

Defendant denies that he had any control or direction whatsoever over the said loading, and therefor says, that the loading was done wholly and entirely with a Derrick Boat, appliances, slings, machinery, etc., furnished by Peters, and that <s>all</s> none of the appliances, slings, chains or machinery used in loading belonged to or was furnished by defendant.

Defendant further answering to Paragraph 6, admits that during the course of loading of said boilers on the said steamship, one of them was allowed to drop into the hold of said ship, and was to some extent damaged. As to the amount or the extent of the damage, defendant has not information sufficient to justify a belief, and for that reason denies that that the damage was anything like that set up by plaintiff or as shown on the statement annexed to the petition.

Defendant admits, that the accident in question occurred on April, 17th. 1918, but, demies that said accident was caused or contributed to by the negligence of defendant, or of anyone for whose actions it could or would be held reposible.

Defendant denies, particularly, that the said Peters was in any wise a representative or employee of defendant, and defendant shows, that whatever the said Peters might have done or did, was as the agent and representative of plaintiff.

Defendant admits that it refused to pay this claim, and shows, that <s>such</s> refusal/ demand was

190

predicated on the fact that said demand was wholly unfou
-ned in law or in equity.

Defemdant avers, in answer to Paragraph 12, that
plaintiff's claim for damages alleged to have been sus-
tained through an accident to a boiler which was being i
loaded aboard ship by one Henry Peters, plaintiff con-
tending that said Peters was acting as defendant's agent,
while defendant contends that said Peters was acting as
plaintiff's agent.

Finally, defendant calls Henry Peters into war-
ranty, so that, if a judgment should be rendered against
him, that a like judgment be rendered against Henry
Peters, and prays finally for dismissal of plaintiff's
suit and for general relief.

An exception of no privity of contract was filed
by Henry Peters, called in warranty. The exception was
maintained by his Honor, the Judge of the lower Court.

On the trial of the merits of the case plaintiff
substantially testified in accordance with the allegatie
ons of his petition. He maintains in his testimony that
he had never employed Peters; that he was under no ob-
ligation to do so, and his arrangement with defendant
was simply to put the boilers on their own boat, with
their own derrick, and that was a part of the contract.;
in other words, he asserts and testifies that his con-
tract was not to put them aboard atall, but to deliver
them free along side steamer; that the contract was had
with the defendants simply to get them aboard, and that
defendant was to furnish it's own derrick boat to take
them aboard from the cars, and that Captain Withey told
him that he when delivered these cars to the te the
switch on Elysian Fields Street, or whatever switch it
was, that he, the Captain, would take care of them

191

from that point.

He was asked this question;-

Q- Who was to pay the expenses of loading on the Steamship?

A- The expenses would be charged to me for the loading, I expect for the use of the Southern Pacific Dock, for the Southern Pacific Derrick I mean.

Q- Nowm, were they loaded on to the Stramship by the defendant?

A- About the time I expected they were being loaded on the steamer Captain W. L. Withey rang me up and told me that the boat had to go on the dock, their derrick boat, for repairs, and that he could get Henry Peters derrick if I would pay the bill, so I told him I would have to agree to pay the bill, but, there was no stipulated amount made, and he got Henry Peters to handle the boilers and load them with his derrick boat, and load them on the steamer. In the mean time Capt. Whitey would have to move the cars over to the dock, you know so the derrick boat could reach them, and in doing this loading, why, they let one of the boilers drop.

Q- Did you have any conversation or arrangement with Mr. Peters yourself?

A- None whatever; I never saw Mr. Peters. I never got a bill from Mr. Peters. I did not see the loading of the boilers by Mr. Peters. I was not present when they were loaded.

By the Court; Then I don't see any objection to Mr. Murphy answering the question.

A-(By plaintiff)- I discussed the matter with Capt. Withey afterwards on the dock, about the accident of dropping the boiler, and he told me the circumstances of it. I then went down to inspect the boiler.

192

Q- When did your control over these boilers cease?

A- When I delivered the cars to the switch of the Southern Pacific my control ceased there."

He repaired the boiler that was dropped and the bills, a part of this record, presents the actual amount without any profit whatsoever.

On Cross Examination, he was asked;

Q- What have the defendants to do with the switch on Elysian Fields Street?

A- I don't know. That, is the orders I got, to deliver the cars there; they gave me the orders to deliver the cars there and I did so.

Q- You were to pay the expenses of loading these boilers from the wharf to the ship, were you not?

A- That is the usual custom, but I had no contract in this case to load them.

Q- And according to the usual custom that is always in addition to the ordinary transportation charge?

A- Yes, it is generally in addition to the ordinary transportation charges.

Q- That is, of course, true, regardless of whether the defendant here would do the loading itself, or whether the loading would be done by someone else?

A- Yes.

Q- Were you to pay Peters bill when he did the loading?

A- Yes, Sir.

Q- You agreed to pay it?

A- Yes, Sir.

Q- In spite of the fact that they called you up and asked whether it would be satisfactory to have Peters to do the loading and Peters was to bill you?

A- He said that he could get Peters to do the loading provided I would pay his bill. I told him that was

alright, I would pay the bill."

That closes the testimony for plaintiff.
For defendant; Bayley M. Clarke was the Commercial Agent
of the Southern Pacific Steamship line, at New Orleans,
representing the Director General after the government
took control, and it was in this connection that this
witness had dealings with plaintiff. This witness being
asked generally;

Q- Now, tell us what you know about this particular
matter? - Substantially answered; " We made all arrange
ments and gave the word to plaintiff to let the boilers
come down; they were to be switched at Elyscian Fields
Atreet, the Mixk M. L. & T. tracks, where the derrick
would hoist them off the cars to hoist them on the
ship and they then were to be switched to the foot of
Elsycian Fields Street at the river front; there is
where the vessel was located, that is St. Ann St.

Q- Tell me what you did and what Mr. Murphy said?

A- Mr. Murphy was informed that the derrick was out of
commission, and in order to load the boilers on to the
Momus, it would be necessary to get Peters derrick, and
we did not want to do anything without Peters consent,-fr
for the simple reason it would cost him, Murphy, more
money. Mr. Murphy told me, in the presence of witnesses,
in my office, to go ahead, get Mr. Peters derrick, and
send him the bill for the charges; that he wanted to
get these boilers to New York, as he had freight room
engaged out of there, and he would have to pay dead
freight; he said, he did'nt care how the boilers got
in the Momus; ' get them there'.

Q- What is the usual course of proceedure with regard to
the steamship company? Does it's transportation cover
the loading of heavy articles into the vessel?

194

A- Yes, it is shown as derrick charges.

Q- Now, in your conversation and agreement with Mr. Murphy, for whom was Peters engaged?

A- For Mr. Murphy.

Q- To whom was Peters to send his bill?

A- To Murphy.

Q- State the fats with regaed to that from that conversation; not your understanding of it, but what the fact was?

A- To employ Pet_rs for account of Murphy.

George E. Bays, testified, that he was present at a conversation between Mr. Clarke and Mr. Murphy, which conversation took place April, 15th. 1918, at Clarkes office, and he substantially says, that our derrick boat was out of commission and it would become necessary if the boilers were to be moved that somebody else do the work. Capt. Withey asked Mr. Clarke to get in touch with Mr. Murphy to let Murphy know the real situation which Mr. Clarke did. And then it was agreed between Clarke and Murphy that Peters derrick was to do the work and this was for the account of Murphy, and Mr. Murphy was to pay Peters bill.

James Swan, Asistant Stevedore, for defendant, operating SOuthern Pacific under Cap. Withey, substantially testified, that all the slings, appliances and derrick used in this transaction belonged to Peters; we had nothing.

Q- State whether anything used was furnished by the defendant?

A- Nothing that I know of outside of Peters derrick, that is his wire slings and his purchases.

Capt. L. H. Withey, testified as follows;

Q- You are the Capt. Withey referred to by Mr. Clarke in his testimony just now?

A- Yes, Sir.

Q- You are the Port Captain of the defendant?

A- Yes, Sir.

Q- You were the Port Captain during 1918?

A- Yes, Sir.

Q- You are familiar with this transaction, are you not?

A- Yes, Sir.

Q- Did you state you would have Peters do the work?

A- Yes, Sir.

Q- Did you state for whom Peters would act in doing it?

A- Yes, Sir.

Q- For whom did you say?

A- Mr. Murphy.

Q- What did he say?

A- He said alright.

He goes on further, substantially, to sate, that in a conversation with Peters that Peters said that he was doing the work entirely for John H. Murphy, and was to bill Murphy for it.

Q- Will you state, whether or not, the arrangements you finally concluded with Peters were in line with the conversation you had with Mr. Murphy?

A- Yes; on the ship before the job started, I had it distinctly understood with Peters that he was to bill Mr. Murphy, and he was working for Mr. Murphy.

Q- What control did you have over the loading of the boilers on to the ship?

A- No more than to instruct where it should be placed in the ship, and that I left to my Stevedore, Mr. Swan.

Q- And that is the information that you transmitted to Mr. Murphy?

A- Yes; of course; that implies the fact that I was not doing the job. I had nothing to do with manipulating the derrick boat or handling the boilers.

196

Q- Let me ask you this, if after the S. P. derrick boat
went out of commission, if you had wanted Peters to do
the work for you, and not for Mr. Murphy, would it have
been necessary for you to take up any question with Mr.
Murphy?

A- No, Sir.

A careful reading of all the testimony in this
record convinces us beyond a reasonable doubt, that the
employment of Mr. Peters was made know to plaintiff.
That, he, plaintiff, agreed to the employment of Mr.
Peters and agreed to pay Mr. Peters bill; agreed that
Mr. Peters do the work in question at his, plaintiff's,
responsibility, and, that therefore, when one of the
boilers involved in this case was for a time put out of
commission, had to be repaired and was repaired by Mr.
Murphy, for which he claims $825.50., from defendant,
that legally nor morally was defendant liable or respon-
sible, and that plaintiff, and that he alone was the
only party for whom the work was done and for whose
account there can be no liability on the part of the
defendant.

For the reasons herein assigned, it is ordered,
adjudged and decreed, that the judgment of the lower
Court, be and the same is hereby annulled, avoided and
reversed, and that there now be judgment in favor of
defendant with his costs in both Courts.

Judgment Reversed- Judgment for Defendant.